## HAMMOND'S CASE.

A witness may testify to his belief of the genuineness of handwriting from his *acquaintance* with the handwriting of the party ; whether this acquaintance were gained by having seen the person write,—or having received letters from him,—or having at any time seen writing either *acknowledged or proved to be his.*

And there is no distinction between civil and criminal cases, in the application of this rule.

THE prisoner was indicted for the forgery of a check on the bank of *Portland*, in the name of *Attwood & Quincy.*

The *Attorney General* proved that a sheet of paper was found in the prisoner's chest on which were written six or seven blank checks, each signed with the name of " *Attwood & Quincy*";— and that the prisoner acknowledged these checks to have been

written by himself; but said that it was done after the officers
of the bank had accused him of the forgery, and after he had
written another check of the same tenor at their request and
for their inspection ; and that it was only an unmeaning scrawl.
This paper, it appeared, was since lost, or unintentionally de-
stroyed.

He then offered one of the directors of the bank as a wit-
ness, to prove that he had seen and critically examined that
sheet, and to testify to the similitude of the signatures, and his
belief that the check described in the indictment was signed by
the prisoner with the names of *Attwood & Quincy.*

To the admission of this evidence the counsel for the prison-
er objected, but the Judge who presided at the trial overruled
the objection;—and the prisoner, being thereupon convicted,
now moved that the verdict be set aside, because of the admis-
sion of that evidence.

*Daveis,* for the prisoner, contended that the only mode of
making proof by handwriting was by actual knowledge of it;
derived,—1st. from having seen the party write,—2d. from cor-
respondence not denied to be genuine :—and that the mode re-
sorted to in this case was novel, and not recognized in princi-
ple by any judicial decision. And he relied on *The King v.
Cator,* 4 *Esp.* 117, and *Mr. Day's* note to that case. *Gilb.
Evid.* 54.

*The Attorney General* agreed with the prisoner's counsel, that
testimony to handwriting must be founded in actual acquaint-
ance with the autography of the party ; but he contended that
this acquaintance might be gained as well from the inspection
of writings confessedly genuine, as from either of the two meth-
ods mentioned ; and that in the present case the testimony of
the witness ought, upon legal principles, to be received, it ap-
proaching at least as near to positive proof as if derived from
correspondence with the party.

MELLEN C. J. now delivered the judgment of the Court,
as follows.

In the course of the trial of this cause it was proved that a
sheet of paper was found in the prisoner's chest, upon which
were written several bank checks, signed with the names " *Att-*

*wood & Quincy.*" It was also proved by the confession of the prisoner, that the body and signature of each of those checks was in his handwriting, and that they were all lost or destroyed, so that they could not be produced on the trial;—and *Charles Fox*, who had carefully examined those checks and their signatures, was permitted to testify to the *similitude* between those signatures and that of the forged check, and to *his belief* that the signature of *that* check was in the handwriting of the prisoner. Was this proof admissible? If not, the verdict must be set aside;—otherwise, sentence must follow.

Whatever doubts were formerly entertained, it is now perfectly settled that the same rule of evidence upon this subject is equally applicable to civil and criminal cases. 1 *Phillips' Evid.* 371. *The King v. Cator*, 4 *Esp. Rep.* 117. 2 *McNally's Evid.* 394, 417. Note to *The King v. Cator*, 4 *Esp. Rep.* 273. *a.* *Phillips*, page 372, says—" It is an established rule " of evidence that handwriting cannot be proved by com≠ " paring the paper *in dispute* with any other paper acknowl≠ " edged to be *genuine.*" This rule is not in force in this State, or in *Massachusetts*, with the same strictness and to the same extent as in *England.* *Homer v. Wallis*, 11 *Mass.* 312. But it appears by many cases that a witness may testify that the signature in question is the handwriting of the person attempted to be charged, from his acquaintance with such person's hand; which acquaintance may have been gained by having seen such person write,—having received letters from him, —or having *seen writing acknowledged or proved* to be such person's handwriting.—The case at bar falls within this last rule.

Proof of this kind was admitted in *Sidney's* case, 3 *St. Tr.* 802—and in *Ld. Preston's* case, 4 *St. Tr.* 446—7. The same principle was admitted and established in the case of *Ld. Ferrer's v. Shirley*, *Fitzgibbon's Rep.* 195. There, in order to prove the handwriting of *Cottington*, a subscribing witness to a pretended deed of the Earl, a person was produced and was ready to testify that he had seen letters which his master *told him* had been written by *Cottington.* This witness, so offered, was rejected by the Court, because he could not testify, nor was it proved, that such letters were *in fact written by Cottington.* It appears that he would have been admitted, if *this fact* had been

established,—and even *without producing the letters*, or shewing that they could not be produced. *Phillips*, page 369, commenting on this case, says, " The rule to be deduced is—that a " witness may be admitted to speak to a person's handwriting, " *if he has seen letters which can be proved to have been written by* " *him*." He intimates that it would be reasonable that the opposite party should be allowed to call for the production of the letters for examination;—but this principle, if well founded, cannot apply to papers which have been lost or destroyed without fraud or fault.

The same principle is recognized and the same kind of proof was admitted in *Layer's* case 6 *St. Tr.* 275. In the trial of *the Seven Bishops* the same kind of proof was admitted as to several of them; and though the Court were divided in opinion, yet it was considered legal and proper in *civil causes ;* but as the distinction between civil and criminal causes touching this point no longer exists, the case is an authority in support of the admission of *Fox's* testimony. The case of *The King v. Cator*, is different from the case at bar. But even there, Baron *Hotham* in giving his opinion says, " I do not know how that gen- " tleman [the inspector of franks,] could speak to the handwrit- " ing, unless he could say he had seen the party write, *or unless* " *he had been in the habit of correspondence with him*, excepting " that he is called to speak as a man of science to an abstract " question." This knowledge of the party's handwriting, gained by *correspondence*, seems not to be more certain than that gained from seeing papers or letters *expressly acknowledged* to be his writing. If the case of *The King v. Cator* be considered as variant from those above cited, and tending to shew the inadmissibility of the testimony of *Fox*, it may be remarked that Baron *Hotham* considered it directly and completely a " comparison of hand,"—and in that sense in which the rule in *England* in some respects differs from the rule in *Massachusetts* and in this State. In the case of *Smith v. Fenner*, 1 *Gal.* 170, Mr. Justice *Story* admitted a witness who swore to the *handwriting* of the scribe who wrote the will then in question, and produced certain deeds in his possession, and was permitted to swear to certain peculiarities of resemblance in the writing;— the Court observing that such was " not a mere comparison of " hands."

On these authorities, and for these reasons, we are all of opinion that according to the principles of law as now settled, understood, and reduced to practice, the proof objected to was properly admitted; and of course the motion to set aside the verdict is overruled.